IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

VALERIE MCGEE, et al.,
        Plaintiffs,

v.                                    Civil Action No. 3:21cv268

VIRGINIA DEPARTMENT OF
ENVIRONMENTAL QUALITY,
        Defendant.

## OPINION

Valerie McGee, Heather Evans, and LeeAnn Moran,[1] three current and former Remediation Geologists employed by the Virginia Department of Environmental Quality ("DEQ"), assert that DEQ violated the Equal Protection Act ("EPA") by paying them lower wages than male Remediation Geologists for equal work, requiring equal effort, skill, and responsibility. (ECF No. 1, at 1.)[2] They identify three male Remediation Geologists, Jonathan Newbill, John Spangler, and William Whitlock, as comparators. (ECF No. 48, at 4.) DEQ now moves for summary judgment. (ECF No. 41.)

DEQ asserts that the undisputed facts show that Plaintiffs Evans and McGee have failed to identify appropriate comparators. (ECF No. 42, at 1.) DEQ also argues that Plaintiff Moran "has failed to establish that two of her [three] alleged comparators perform substantially equal work as required by the [EPA]." (*Id.*) DEQ concedes that "the material facts in dispute make summary judgment improper on" the issue of whether Moran and Whitlock are valid comparators. (*Id.* at

---

[1] The original complaint also included Plaintiffs Rosalind Chaplin and Brenda Brown. Chaplin voluntarily dismissed her claims on November 15, 2021, (ECF No. 22), and Brown did the same on December 7, 2021, (ECF No. 32).

[2] The Court employs the pagination assigned by the CM/ECF docketing system.

36 n.9.) Nevertheless, DEQ contends that summary judgment is appropriate as to all three plaintiffs because the "salary differences between the [p]laintiffs and their [c]omparators are readily explained by 'factors other than sex,'" including DEQ's long-standing reliance on prior salary history as the main consideration when setting the salaries of new employees. (*Id.* at 1, 37.) Finally, DEQ says that the plaintiffs "have failed to provide any facts to support a willful violation of the" EPA. (*Id.* at 1.) Accordingly, it asks the Court to grant its motion and end the case.

Based on the record before it, the Court concludes that Jonathan Newbill is not an appropriate comparator for any of the plaintiffs because he frequently performs work requiring additional effort and responsibility as a member of the Blue Ridge Regional Office's ("BRRO') pollution response ("PREP") Team. (*See id.* at 30–31; ECF No. 48, at 5 ¶ 8; *see also infra* p. 15.) Further, although the Court finds that John Spangler is a valid comparator for each of the plaintiffs, the Court concludes that no rational jury could reject DEQ's proffered defense that Spangler's wage discrepancy is based on a factor other than sex, namely, DEQ's documented use of Spangler's prior, private-sector salary when it set his starting wage in April 2007.

Because DEQ paid William Whitlock higher wages for work of equal skill, effort, and responsibility as the plaintiffs, the Court finds that he is an appropriate comparator for all three women. Furthermore, although DEQ presents compelling evidence that Whitlock's higher salary could be the result of factors other than sex, including Whitlock's length of state employment and DEQ's unofficial policy of seniority, a genuine issue of material fact remains as to whether such permissible factors, *in fact*, explain the discrepancy. *See EEOC v. Md. Ins. Admin.*, 879 F.3d 114, 121 (4th Cir. 2018); *Spencer v. Va. State Univ.*, 919 F.3d 199, 206 (4th Cir. 2019). Accordingly, the Court will DENY DEQ's motion. As explained below, the Court will leave the issue of willfulness to the factfinder.

# I. **BACKGROUND**

Litigation regarding DEQ's salary policies has gone on in this Court for several years. "On June 1, 2020, four female DEQ employees moved for conditional certification of a collective action for alleged violations of the [EPA] Amendments to the Fair Labor Standards Act [('FLSA")]." [3] (*Id.* at 1–2.) That case ended on July 7, 2021, when the Court concluded that the last remaining plaintiff, a Costal Planner, failed to establish a prima facie case under the EPA. *See also Polak v. DEQ,* No. 3:20cv270, 2021 WL 2750448, at *2 (E.D. Va. Apr. 27, 2021) (denying Polak's partial motion for summary judgment).

On April 21, 2021, the *McGee* plaintiffs filed this suit against DEQ alleging nearly identical claims.[4] (ECF No. 1.) In their complaint, the plaintiffs assert that "[s]tarting earlier than April 1, 2017, and continuing to July 1, 2019," DEQ violated the EPA by paying the plaintiffs "lower wages than those paid to their male colleagues for performing equal work as Environmental

---

[3] Once the court granted conditional certification, twenty-three additional female employees and former employees . . . "opted in", bringing the number of plaintiffs to twenty-six . . . . The gravamen of the plaintiffs' claims focused on allegations that DEQ violated the EPA by using prior salary history to set starting salaries to the detriment of the female plaintiffs and that the use of prior salary history could not be a legitimate factor other than sex constituting an affirmative defense under the EPA. The parties conducted extensive discovery[,] and on April 5, 2021, the Court granted DEQ's motion for summary judgment on the issue of using prior salary history, holding "that the Fourth Circuit allows employers to raise prior salary as an affirmative defense in EPA cases." [*See Abe v. DEQ.*, No. 3:20cv270, 2021 WL 1250346, at *4 (E.D. Va. Apr. 5, 2021).] On April 6, 2021, the Court granted DEQ's motion to decertify the [p]laintiffs' . . . collective action.

(ECF No. 42, at 2 (cleaned up).) On April 20, 2021, the Court entered the parties' agreed order severing the remaining plaintiffs' claims, leaving only Plaintiff Elizabeth Polak. (*Id.*)

[4] Indeed, the two complaints include numerous passages of identical text. (*Compare* Civil Action No. 3:20cv270, ECF No. 1 ¶¶ 8-14, 18, 24–31, *with* Civil Action No. 3:21cv268, ECF No. 1 ¶¶ 8-14, 18, 22–29.)

Specialist II, Remediation Geologists." (*Id.* at 5.)  The plaintiffs argue that through July 1, 2019, DEQ used the "salary offered to each woman by a prior employer, regardless of its bias," to determine her starting pay at DEQ.  (*Id.* at 6.)  Although DEQ abandoned its use of prior salary history in July 2019, the plaintiffs contend that DEQ took no in action, "in the aftermath, to remedy the wage disparity suffered and endured by women hired and employed" in the years prior.  (*Id.* at 7.)  Finally, and contrary to this Court's ruling in *Abe*, they assert that "past salary . . . cannot be a 'factor other than sex' when used . . . to fix . . . [a] salary."  (*Id.* at 10 (emphasis omitted).)

The plaintiffs–Evans, Moran, and McGee–identify three comparators: Whitlock, Spangler, and Newbill.  They proffer that each of the men is a proper comparator for any of the plaintiffs.

## II. <u>FINDINGS OF FACT</u>[5]

Since April 1993, DEQ has served as the environmental agency of the Commonwealth of Virginia.[6]  (*Id.* at 3 ¶ 1.)  DEQ's central office is in Richmond, Virginia, and it maintains six regional offices throughout the Commonwealth, including the Piedmont Regional Office ("PRO"), (*id.* at 6 ¶ 12), the Tidewater Regional Office ("TRO"), (*id.* at 9 ¶ 34), the Southwest Regional Office ("SWRO"), (*id.* at 16 ¶ 74), and the BRRO, (*id.* at 13 ¶ 54).

The Department of Human Resource Management ("DHRM") is the central human

---

[5] Pursuant to Local Civil Rule 56(B), the moving party at summary judgment must set forth "'a specifically captioned section listing all material facts as to which the moving party contends there is no genuine issue,' as well as citations to the record to support such facts."  *Earl v. Norfolk State Univ.*, No. 2:13cv148, 2016 WL 1078280, at *3 (E.D. Va. Mar. 17, 2016) (quoting E.D. Va. Loc. Civ. R. 56(B)).  "The local rule further provides that a responsive brief should include a similar 'specifically captioned section listing all material facts as to which it is contended that there exists a genuine issue,' as well as citations to the record."  *Id.* (quoting Rule 56(B)).  "The local rule expressly permits the Court to assume the truth of any facts identified by the moving party as undisputed that are not expressly controverted by the opposing party."  *Id.*

[6] "On April 1, 1993, the State Water Control Board merged with several other agencies to form DEQ."  (ECF No. 42, at 17 ¶ 81.)

4

resources agency for the Commonwealth, including DEQ. (*Id.* ¶ 2.)  Among other things, DHRM "establishes the compensation policies applicable to state employees." (*Id.*)  Today, the Commonwealth utilizes "Pay Bands" to "determine the minimum and maximum salaries for a given job"; it previously employed a system of grades and steps. (*Id.* at 4 ¶ 6.)  Over the decades, employees of the Commonwealth have been subject to various compensation policies.  As relevant here, "[f]rom July 1, 1980 to September 16, 1993, the starting pay for new hires at state agencies, including DEQ (and its predecessors [the Department of Personnel and Training ("DPT")]) was subject to Policy 3.04 of the DPT Policies and Procedures Manual." (*Id.* at 3 ¶ 3.)  Pursuant to DPT's 1988 Compensation Manual, "[p]rior salary [was] the primary determinant of starting pay." (*Id.*)  In September 1993, DPT updated its compensation policies. (*Id.* ¶ 4.)  "DPT's 1998 Compensation . . . Manual reiterated that '[a]n applicant's salary history should be the primary determinant of starting pay' but . . . provided that applicants could start on any of the twenty steps on a grade based on experience, with exceptions for salaries in excess of ten percent . . . of the applicant's pre-employment salary." (*Id.*)  The Commonwealth changed its compensation policies again in September 2000 by, among other things, "creat[ing] thirteen pay factors for agencies to consider when setting a new employee's starting pay." (*Id.* ¶ 5.)  Nevertheless, "current salary" remained "the primary factor."[7] (*Id.*; *see also id.* at 4 ¶ 8.)

---

[7] The remaining twelve factors were: (1) agency business needs, (2) budget implications, (3) the employee's duties and responsibilities, (4) internal salary alignment[,] (5) the knowledge, skills, and abilities required, (6) the long-term impact on the agency, (7) market availability (the availability of suitable, qualified candidates in the general labor market), (8) employee performance, (9) salary reference data (a composite of relevant salary information), (10) total compensation (pay and benefits), (11) training, certification, and license requirements, and (12) work experience and education.

(*Id.* at 4 ¶ 5.)

5

At DEQ, "[a]n employee's core job duties . . . are set forth in their Employee Work Profile ("EWP")."[8] (ECF No. 42, at 5 ¶ 9.) As reflected in their EWPs, Remediation Geologists at DEQ "deal with the remediation of leaking storage tanks," including both residential tanks and commercial or other tanks that are subject to federal regulations. (*Id.* ¶ 11.) Although the precise needs of each case may vary, Remediation Geologists "review reports and technical information to make risk-based evaluations and communicate with responsible parties," generate reports, and, when needed, perform site visits and generate corrective action plans ("CAPs"). (ECF No. 48, at 6 ¶ 4.) Further, all Remediation Geologists at DEQ "respond to emergency petroleum releases; review and sign correspondence such as [CAPs] and closure letters; respond to reports of contaminated water supplies; and manage releases and cases regarding the Virginia Petroleum Storage Tank Fund." (*Id.* at 7 ¶ 5.)  In summary, "the largest portion of [the p]laintiffs and their comparators [work] is devoted to Case Management." (*Id.* at 6 ¶ 1.)  Further, despite some variety in the regional geology covered by different offices, work in any of the offices requires application of "the same geologic knowledge."[9] (ECF No. 48, at 7 ¶ 6.)

Because the offices have different managers and different levels of support staff, however,

---

[8] The Court notes that the plaintiffs point to evidence in the record which suggests that an employee's EWP does not always "comprehensively" reflect all the work that employee performed during the year. (ECF No. 48, at 5–6.) Further, the record reflects that different managers at DEQ include different amounts of detail in the EWPs they complete. (*Compare* ECF No. 48-22 *with* ECF No. 48-23, ECF No. 48-24, ECF No. 48-25, *and* ECF No. 48-27.)_ Finally, although some employees' EWPs assign percentages to portions of his or her work, most of the EWPs in the record do not.

[9] DEQ disputes this fact because it contends that "significant job differences between the [the p]laintiffs and comparators exist." (ECF No. 54, at 3.) The Court finds that DEQ does not specifically dispute that Remediation Geologists employ the "same geologic knowledge" at different offices.  Further, the Court finds that competent evidence conclusively establishes this fact.

DEQ's regional offices handle aspects of their administrative workloads differently. For example, in the PRO, a single employee, Plaintiff Evans, is "responsible for setting up all new tank remediation cases" in DEQ's "CEDS" database.[10] (ECF No. 42, at 6 ¶ 14.) In the TRO and the SWRO, case managers, like McGee and Whitlock, "open their own cases in CEDS due to a lack of administrative support," (*id*. at 9 ¶ 35, 16 ¶ 76), and in the BRRO, an administrative employee sets up new cases as they come in, (*id*. at 14 ¶ 57).

Other administrative duties vary from office to office as well. In the PRO and the BRRO, a designated employee handles all Freedom of Information Act ("FOIA") requests. (*Id*. at 10 ¶ 39, 14 ¶ 62.) But in the TRO, case managers rotate FOIA response duties daily and must respond to FOIA requests roughly one day each week. (*Id*. at 10 ¶ 39.) In the SWRO, case managers each respond to FOIA requests in shifts lasting approximately three months out of the year. (*Id*. at 16 ¶ 77.) Similarly, an administrative employee drafts release letters in the PRO, whereas case managers in the TRO write their own. (*Id*. at 10 ¶ 38.)

Finally, each office handles a different number of "regulated" cases as opposed to "nonregulated" cases,[11] and regional management provides employees with differing directives regarding site visits. For example, Remediation Geologists in the PRO "have discretion on whether to do site inspections by physically going to the site of the leaking tank." (*Id*. at 7 ¶ 17.) In the BRRO, however, case managers are "required to visit all *regulated* case sites a minimum of one time." (*Id*. at 14 ¶ 63 (emphasis added); *see also id*. at 31.)

---

[10] The Court adopts the acronyms used by the parties. Where the parties failed to appropriately define such acronyms, the Court declines to define the terms or take judicial notice of their possible meaning.

[11] "Between 14% and[]16% of the cases in the PRO are regulated cases." (*Id*. at 5 ¶ 11.) "The SWRO has a higher caseload of regulated cases than the PRO but fewer cases overall." (*Id*. at 17 ¶ 79.)

This case involves six Remediation Geologists.

### A. Evans

Evans began working in the PRO as a Remediation Geologist in December 2001. (*Id.* at 18–19 ¶ 88.) "At the time she applied to DEQ she was in graduate school and serving as an unpaid volunteer." (*Id.*) Her starting salary was $34,910, and her current salary is $60,465. (*Id.*)

Since 2005, Evans works largely from home, commuting to the office on Thursdays. (*Id.* at 6 ¶ 12.) Evans reports to a Team Leader, Lisa Elizardo, (*id.* ¶ 13), and her supervisor is Regional Remediation Manager Robyne Bridgman, (*id.* at 7 ¶ 18). Evans performs all the duties of a Remediation Geologist. (ECF No. 48, at 11 ¶ 31; ECF No. 54, at 4.) Evans also performs a variety of additional, administrative tasks at the PRO. Evans sets up "all new tank remediation cases for the PRO" and "performs specialized queries at management request," such as stale query reports, compliance audits, and an annual final year managerial report. (ECF No. 42, at 6 ¶ 14, 7 ¶¶ 21–23.) "Since 2017 or 2018 Evans has been the only employee from the PRO serving on an expert panel for CEDS." (*Id.* at 8 ¶ 26.) As part of this role, Evans is "responsible for training the entire PRO remediation staff on [system] upgrades." (*Id.*) Evans also spends several days each year reviewing "Brownfields Grant, BFPP and VRP requests for the PRO tank group to see whether there are any tanks with issues or concerns." (*Id.* ¶ 27.) Finally, Evans is responsible for reviewing requests and issuing petroleum discharge permits and "reviewing CEDS data for the Virginia Environmental Excellence Program ("VEEP") to make sure the VEEP applicant has no compliance deficiencies and there are no open problem cases in remediation." (*Id.* at 8–9 ¶¶ 28–29.)

As a PRO employee, Evans is not required to perform mandatory site visits, respond to FOIA requests, or draft release letters, (*id.* at 10 ¶¶ 38–39), and she does not serve on a PREP

8

Team, (*id.* at 7 ¶ 17–18).

### B. McGee

DEQ hired McGee as an Environmental Quality Enforcement Compliance Specialist in March 2000.  (*Id.* at 18 ¶ 85.)  McGee's starting salary in the PRO was $39,516.  (*Id.*)  Prior to working for DEQ, "McGee worked as a staff geologist with a private contractor" and earned $38,000.  (*Id.*)  In 2017, McGee transferred to the TRO, where she became a Remediation Geologist, Senior II.  (*Id.* ¶ 86.)  Pursuant to her transfer, McGee's salary increased to $61,600, and her current salary is $69,951.  (*Id.*)

In the TRO, McGee performs all the core duties of a Remediation Geologist, opens her own cases in CEDS, drafts release letters, and responds to FOIA requests.  (*Id.* at 9 ¶¶ 35–36; *id.* at 10 ¶¶ 38–39.)  McGee does not serve on a PREP team.  (*Id.* ¶ 40.)  Finally, McGee serves on the TRO work group "responsible for reviewing applications for Virginia Petroleum Discharge Elimination System (VPDES) and Virginia Pollutant Abatement (VPA) permits."  (*Id.* at 10–11 ¶ 41.)  McGee's EWP allocates ten percent of her time to these work group responsibilities.  (*Id.*)

### C. Moran

"Prior to her employment with DEQ, Moran worked for the State of North Carolina with a salary of $23,550."  (*Id.* at 18 ¶ 84.)  Moran began working as a Remediation Geologist for the State Water Control Board in the TRO in November 1992.  (*Id.* at 17 ¶ 81.)  Her starting salary was $26,339.  (*Id.*)  Her salary when she retired in January 2020 was $67,545.  (*Id.* at 17–18 ¶ 81.)  Moran worked her entire DEQ career in the TRO.  (*Id.*)

As a Remediation Geologist, Specialist II in the TRO, "Moran had the same duties and responsibilities as McGee."  (*Id.* at 18 ¶ 82.)  Moran did not serve on the VPDES and VPA workgroup with McGee, however, and she did not serve on a PREP team.  (*Id.* ¶ 83.)

### D. Spangler

DEQ hired Spangler on April 10, 2007, at a starting salary of $57,000.  (*Id.* at 20 ¶ 93.) "Spangler [previously] worked as a senior environmental scientist for . . . private contractor [URS] with a salary of $57,000." (*Id.*)

During his time as a consultant with URS, Spangler "worked on 'the most significant case' in the PRO involving a major oil pipeline spill." (*Id.* at 12 ¶ 49.)  This work impressed Regional Remediation Manager Bridgman and made her "very keen on hiring [him]." (*Id.* ¶ 50.)  Bridgman identified Spangler as someone who could handle very serious cases.  Accordingly, she "made every effort to get [Spangler's] salary offer as high as possible." (*Id.*)  Bridgman attests that she did so based on her knowledge that private jobs, like Spangler's, pay better than government employment. (*Id.*)  When URS offered Spangler a $20,000 salary increase to stay with them, Bridgman worked to secure a $2,000 increase to Spangler's proposed salary. (*Id.* at 12–13 ¶ 50.) Today, he earns $78,257 at DEQ. (*Id.* at 20 ¶ 93.)

Spangler performs the core case management duties of a Remediation Geologist.  He does not set up cases in CEDS, perform permit reviews, run specialized reports, review Brownfields or VRP grant applications, respond to FOIA requests, or draft release letters. (*Id.* at 9 ¶ 29, 10 ¶ 38, 11 ¶ 45.)  Spangler is also not a member of a PREP team.[12]  Spangler performs at least twenty-five discretionary site visits each year. (*Id.* at 12 ¶ 46.)

### E. Newbill

Newbill began working for DEQ in the BRRO in October 2014. (*Id.* at 20 ¶ 92.) At his former employer, Newbill earned approximately $80,000 annually. (*Id.* at 13 ¶ 54.)  "At the time

---

[12] *See id.* at 30 (describing Newbill's PREP team status ad "unique among the [the p]laintiffs and the other comparators").)

he started at DEQ Newbill had approximately fifteen years of experience in the private environmental consulting sector." (*Id.*)  His starting salary at DEQ was $63,000, and his current salary is $76,621.  (*Id.* at 20 ¶ 92.)

In the BRRO, Newbill performs all the duties of a Remediation Geologist.  He does not set up new cases in CEDS, run reports at the request of his manager, or respond to FOIA requests. (*Id.* at 13–14 ¶¶ 56–58; *id.* at 14 ¶ 62.)  He is, however, required to visit all regulated case sites at least once.  (*Id.*  ¶ 63.)  Finally, Newbill serves as a member of the BRRO's PREP team.  (*Id.* ¶¶ 59–60.)  In that role he responds to petroleum releases—including "train derailments, tanker truck accidents, and fish kills"—outside of normal business hours.  (*Id.* at 14 ¶ 59.)

### F. Whitlock

The parties agree to the following summary of Whitlock's employment history:

Whitlock began employment with the Commonwealth of Virginia on November 1, 1979[,] with a starting salary of $12,000.00.  Whitlock left state employment on July 1, 1981[,] with a salary of $13,800.00.  He returned to part-time employment with the Commonwealth on July 1, 1983[,] with a salary of $18,000.00[] and began full-time employment in 1984.  Whitlock has remained continuously employed by the Commonwealth ever since.
Whitlock, like other state employees, has received salary increases as approved by the Virginia General Assembly for state employees.  Between 1983 and 2014 Whitlock received state employee raises that increased his salary to $60,381.00.  In 2014, Whitlock had a competitive voluntary transfer from DMME to a position as coordinator of the ambient groundwater monitoring program located at DEQ's Richmond office.  His salary increased from $63,381.00 to $68,000 as a result of this competitive voluntary transfer.  In July 2015, Whitlock had a competitive voluntary transfer to [the SWRO] . . . as a [R]emediation [G]eologist Senior.  He did not receive an increase in salary as a result of his transfer to that position in the SWRO. On August 10, 2015[,] Whitlock received a state employee salary increase to $71,310.00.  On July 10, 2017[,] another state employee increase raised his salary to $73,449.00.  On June 10, 2019, another state employee increase raised his salary to $77,121.00.  On February 25, 2020, Whitlock received a Career Path Adjustment from Remediation Geologist Senior to Remediation Geologist Senior II.  This resulting 5% pay increase raised his salary to $80,977.00.  On June 10, 2021, the Virginia General Assembly approved a 5% pay increase for state employees that increased Whitlock's salary to $85,026.00.

(*Id.* at 19–20 ¶ 91.)

Whitlock performs all core case management duties in his current role as a Remediation Geologist. Whitlock sets up his own cases in CEDS and responds to FOIA requests during three months of each year. (*Id.* at 16 ¶¶ 76–77.) Whitlock does not "routinely" run CEDS reports at the direction of his supervisor, he does not participate on a VPDES and VPA workgroup, and he is not on a PREP team. (*Id.* ¶ 75; *see supra* n. 12.) Because of Whitlock's extensive knowledge, he spends up to five percent of his time providing "[t]echnical [a]ssistance on [g]eologic and [h]ydrogeologic matters." (*Id.* at 16–17 ¶ 78.) Whitlock frequently performs site visits, but the record is silent as to whether he is required to do so. (*Id.* at 17 ¶ 79.)

### III. <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 56(a) directs a court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[13] Fed. R. Civ. P. 56(a). In deciding a summary judgment motion, the court must draw all reasonable inferences in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). But if the non-moving party fails to sufficiently establish the existence of an essential element to a claim on which it bears the ultimate burden of proof, the court should enter summary judgment against that party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### IV. <u>DISCUSSION</u>

"The EPA prohibits gender-based discrimination by employers resulting in unequal pay

---

[13] "A fact is material if it 'might affect the outcome of the suit, under the governing law,'" and "[a] dispute is genuine if 'a reasonably jury could return a verdict for the nonmoving party.'" *Hupp v. Cook*, 931 F.3d 307, 317 (4th Cir. 2019) (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013)).

for equal work." *Md. Ins. Admin.*, 879 F.3d at 120 (citing 29 U.S.C § 206(d)(1); *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974)).   To survive summary judgment, an EPA plaintiff must establish a prima facie case of discrimination. *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 654–55 (4th Cir. 2021) (citing *Md. Ins. Admin.*, 879 F.3d at 120).   To establish a prima facie case, "a plaintiff must demonstrate that '(1) the defendant-employer paid different wages to an employee of the opposite sex (2) for equal work on jobs requiring equal skill, effort, and responsibility, which jobs (3) all are performed under similar working conditions.'"[14] *Sempovich*, 19 F.4th at 654–55 (quoting *Md. Ins. Admin.*, 879 F.3d at 120).

Once a plaintiff establishes a prima facie case, a defendant is not entitled to summary judgement "unless a rational jury could not have rejected [the defendant's] proffered reasons for the wage disparities." *Md. Ins. Admin.*, 879 F.3d at 122.   Thus, "the burdens of production *and* persuasion shift to the defendant-employer to show that the wage differential was justified by one of four affirmative defenses listed in the statue." *Id.* at 120 (emphasis in original) (citing *Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336, 344 (4th Cir. 1994)).   These affirmative defenses include: "(1) a seniority system; (2) a merit system; (3) a pay system based on quantity or quality of output; or (4) a disparity based on any factor other than gender."[15] *Md. Ins. Admin.*, 879 F.3d at 120 (citing 29 U.S.C. § 206(d)(1); *Corning Glass*, 417 U.S. at 195).   But "[w]hile an employer may be entitled to summary judgment on an EPA claim if the employer establishes an affirmative defense as a matter of law, the burden on the employer necessarily is a heavy one." *Id.* "[A] viable

---

[14] "A[ female] EPA plaintiff is not required to demonstrate that males, as a class, are paid higher wages than females, as a class, but only that there is discrimination in pay against an employee with respect to one employee of the opposite sex." *Md. Ins. Admin.*, 879 F.3d at 122.

[15] An employer may raise prior salary as an affirmative defense in EPA cases as a "factor other than sex." *See Abe*, 2021 WL 1250346, at *2 (quoting 29 U.S.C. § 206(d)(1).

affirmative defense under the EPA requires more than a showing that a factor other than sex *could* explain or *may* explain the salary disparity. Instead, the EPA requires that a factor other than sex *in fact* explains the salary." *Id.* at 123 (emphasis in original).

The Court will first determine whether any of the three plaintiffs present a prima facie case of discrimination under the EPA. Because the Court concludes that they have established a prima facie case sufficient to survive summary judgment, the Court will next consider DEQ's proffered affirmative defenses.

### A. The Plaintiffs' Prima Facie Case

#### 1. Different Wages

The record establishes, and DEQ does not dispute, that DEQ paid higher wages to the three identified male comparators—Whitlock, Spangler, and Newbill—than it paid to the three female plaintiffs. Thus, the plaintiffs satisfy this element, and the Court must determine whether the identified comparators and the plaintiffs performed "substantially equal work." *Md. Ins. Admin.*, 879 F.3d, at 121.

#### 2. Equal Work

"In interpreting the EPA, '[e]qual means *substantially equal.*'" *Wheatley v. Wicomico Cnty.*, 390 F.3d 328, 332 (4th Cir. 2004) (alteration and emphasis in original) (quoting *Hodgson v. Fairmont Supply Co.*, 454 F.2d 490, 493 (4th Cir. 1972)). "Congress chose the word 'equal' over the word 'comparable' in order 'to show that the jobs involved should be virtually identical, that is . . . very much alike or closely related to each other.'" *Id.* at 333 (quoting *Brennan v. City Stores, Inc.*, 479 F.2d 235, 238 (5th Cir. 1973)). To satisfy this standard, "it is [generally] not enough to simply show that the comparators hold the same title and the same general responsibilit[ies] as the plaintiff[s]." *Evans v. Int'l Paper Co.*, 936 F.3d 183, 196 (4th Cir. 2019).

14

This is so because "jobs do not automatically involve equal effort or responsibility even if they 'entail most of the same routine duties.'" *Wheatley*, 390 F.3d at 333 (quoting *Hodgson*, 454 F.2d at 493). Jobs are "unequal—despite having the same general core responsibilities—'if *the more highly paid job* involves additional tasks which (1) require extra effort . . . (2) consume a significant amount of the time . . . and (3) are of an economic value commensurate with the pay differential.'" *Id.* (quoting *Hodgson*, 454 F.2d at 493) (emphasis added) (alterations in original).

In contrast,

> [d]ifferences in skill, effort, or responsibility which might be sufficient to justify a finding that two jobs are not equal within the meaning of the EPA if greater skill, effort, or responsibility has been required of the higher paid sex, do not justify such a finding where the greater skill, effort, or responsibility is required of the lower paid sex.

*Brinkley-Obu.*, 36 F.3d at 342 n.12 (quoting 29 C.F.R. § 1620.14(a)).

### i. Jonathan Newbill

All three plaintiffs identify Jonathan Newbill, a Remediation Geologist in the BBRO, as a comparator. In addition to his core case management duties, Newbill is a member of the BRRO's PREP team. (ECF No. 42, at 14 ¶ 59.) As a member of the PREP team Newbill must "respond[] to petroleum releases after normal business hours, including holidays and weekends." (*Id.*) Newbill is "on call" with the PREP team "one week per month from 4:30 p.m. to 8:30 a.m." (*Id.*) While on call, Newbill typically responds to emergencies at least two to three days out of the week and may receive "as many as seven calls in one night." (*Id.* ¶ 60.) None of the plaintiffs are on the PREP team or otherwise tasked with responding to emergency calls outside of normal business hours, during weekends, or on holidays. (*Id.* at 30.) The Court finds that Newbill's PREP team duties constitute significant additional work requiring effort, responsibility, and time beyond the core duties required of all Remediation Geologists at DEQ. Accordingly, the Court finds that

15

Newbill does not perform substantially equal work to the plaintiffs and is not an appropriate comparator for McGee, Evans, or Moran.

### ii. John Spangler

The plaintiffs also identify John Spangler, a Remediation Geologist in the PRO, as a comparator.   The undisputed evidence before the Court shows that Spangler and the plaintiffs perform work "requiring equal skill, effort, and responsibility" under "similar working conditions." *Md. Ins. Admin.*, 879 F.3d at 120.   "The crucial finding on the equal work issue is whether the jobs to be compared have a 'common core' of tasks, i.e., whether a significant portion of the two jobs is identical.   The inquiry then turns to whether the differing or additional tasks make the work substantially different."   *Brewster v. Barnes*, 788 F.2d 985, 991 (4th Cir. 1986) (quoting *Brobst v. Columbus Servs. Int'l*, 761 F.2d 148, 156 (3d Cir. 1985)).  The Remediation Geologists' EWPs, their own testimony, and the testimony of Spangler and Evans's supervisor establishes that the plaintiffs and Spangler share the same core duties and responsibilities.

The parties agree that the EWPs, though not entirely comprehensive, reflect the employees' core responsibilities.  (ECF No. 42, at 5 ¶ 9; ECF No. 48, at 4–5 ¶ 2.)  The "Core Responsibilities" delineated in the yearly EWPs of Evans, McGee, Moran, and Spangler reveal substantially equal case management duties.[16]   Further, the statements of the plaintiffs, the other comparators, and Spangler's supervisor, affirm that core case management duties comprise the bulk of each Remediation Geologist's work.   Indeed, the parties *agree* that  Remediation Geologists in every office devote the largest portion of their time to case management, (ECF No. 48, at 6 ¶ 1), and that

---

[16] The EWPs also reveal that Evans, Moran, McGee, and Spangler each respond to emergency reports in a timely manner, respond to reports of petroleum contamination of water supplies within twenty-four hours, approve Activity Authorization Forms, and manage at least one state lead case each year. (*Compare* ECF No. 48-25, at 16–17, *with* ECF No. 48-22, at 1–2, ECF No. 48-23, at 1–2, *and* ECF No. 48-24, at 1–2.)

shared core tasks include "respond[ing] to emergency petroleum releases [during normal work hours]; review[ing] and sign[ing] correspondence such as [CAPS] and closure letters; respond[ing] to reports of contaminated water supplies; and manag[ing] releases and cases regarding the [VPSTF] requirements." (*Id.* at 7 ¶ 5.)

Nevertheless, DEQ asserts that because the plaintiffs perform *additional* duties that Spangler does not, the plaintiffs and Spangler do not perform equal work.[17] (ECF No. 54, at 6.) This argument fails for two reasons.

First, DEQ offers no evidence indicating that these additional duties lessen the number of cases that each plaintiff manages or otherwise affects the amount of work encompassed by the plaintiffs' core job responsibilities.[18] On the contrary, the "Case Management" sections of the plaintiffs' and Spangler's EWP Performance Evaluations show that each plaintiff annually managed a similar number of cases as Spangler, despite their additional responsibilities.[19]

---

[17] For example, DEQ points out that, unlike Evans, Spangler "does not (1) monitor the PRO case email inbox, categorize the release, and assign the case to a case manager, (2) set up the cases in CEDS, (3) review and issue petroleum general discharge permits, (4) serve as a CEDS Core Lead, (5) review Brownfields, BFPP or VRP requests; or (6) review CEDS data for the Virginia Environmental Excellence Program." (ECF No. 42, at 28.) It also notes that "TRO-specific differences in tasks, duties, and responsibilities readily demonstrate substantial differences between the day-to-day work activities of Moran and McGee and those of . . . Spangler." (*Id.* at 33.) While Moran and McGee handle their own case setup duties, Spangler does not. *See supra* pp. 9–10. McGee is responsible for responding to FOIA requests involving the tank program one day per week on average. *See supra* p. 9. Spangler does not respond to FOIA requests. *See supra* p. 10. Finally, McGee and Moran draft a significant number of release letters each year, but Spangler does not draft any. *See supra* pp. 9–10.

[18] Instead, DEQ emphasizes the number of hours that each plaintiff spends performing duties that Spangler is not required to perform. (*Id.* at 7–8; *see also id.* at 4 ("DEQ admits that Evans performed the duties of a remediation geologist and also performed tasks that other remediation geologists in the [PRO] did not perform.").)

[19] For example, Evans's 2019 EWP performance evaluation reflects that she "closed 114 cases and . . . managed 155 cases in total during [the recorded] performance cycle." (ECF No. 48-22, at 1.) She closed 89 cases and managed 130 cases in 2020, (*id.* at 6), and closed 69 cases and

Although these numbers do not necessarily reflect the particular needs of each given case, DEQ does not point to anything in the record showing that Spangler's cases required, overall, more effort, skill, or responsibility, than the cases managed by the plaintiffs.

"[A] plaintiff's additional responsibilities [do] not remove her claim from the ambit of the [EPA]." *Brinkley-Obu*, 36 F.3d at 342 n.12 (citing *Hein v. Oregon Coll. of Educ.*, 718 F.2d 910, 917 (9th Cir. 1983)). "If an individual's [EPA] claim could be defeated by showing that the plaintiff has additional duties that are not performed by the employees of the opposite sex, employers could easily subvert the intent of the Act by assigning additional duties to potential plaintiffs." *Hein*, 718 F.2d at 917. Accordingly, while the evidence on the record proves that each plaintiff performs additional duties that Spangler does not,[20] the Court finds that such duties do not make Spangler an improper comparator.

Second, DEQ points out that Spangler performs significantly more site visits annually than Evans. The Court notes however, that such visits are *discretionary*, and thus do not constitute a core function of Spangler's job. Furthermore, DEQ makes no showing that these site visits require additional skill, effort, or responsibility or "are of an economic value commensurate with the pay

---

managed 110 cases in 2021, (*id.* at 12). McGee's 2019 EWP performance evaluation reflects that she closed "80 [plus] cases" and managed an average of 70 cases per month. (ECF No. 48-23, at 1.) She closed out 169 cases and managed an average of 71 cases per month in 2020, (*id.* at 6), and closed out 88 cases and managed a total of 166 cases in 2021, (*id.* at 10). Moran's 2018 EWP performance evaluation reflects that she closed "65 cases" and managed 148 cases in total that year. (ECF No. 48-24, at 1.) Finally, during his 2018 review period, Spangler closed 65 cases and managed 110. (ECF. No. 48-25, at 1.) During 2019, he closed 63 cases and managed a total of 116. (*Id.* at 6.) During 2020, he closed 57 cases and managed a total of 110 cases. (*Id.* at 11.) During 2021, Spangler closed 54 cases and managed a total of 102 cases. (*Id.* at 16.)

[20] "Robyn Bridgman, the Regional Remediation Manager who supervises Evans and Spangler, explained that '[a]lthough Spangler's and Evans'[s] 'EWP job duties were the same,' Evans 'had a lot more duties.'" (ECF No. 42, at 12 ¶ 47 (quoting ECF No. 42-9, at 15).)

18

differential."[21] *Wheatley*, 390 F.3d at 333 (quoting *Hodgson*, 454 F.2d at 493).

The Court finds that the evidence establishes that the plaintiffs and Spangler share a common core of substantially equal work responsibilities which they perform under substantially similar conditions. Accordingly, the Court concludes that Spangler is a valid comparator for Evans, McGee, and Moran.

### iii. William Whitlock

The final comparator identified by the plaintiffs is William Whitlock. Whitlock is a Remediation Geologist in the SWRO. DEQ admits that summary judgment is inappropriate with respect to whether Whitlock is a valid comparator for Moran. (ECF No. 42, at 36 n.9.) Because Whitlock and Moran perform the same core job responsibilities and because Whitlock's "technical assistance" duties do not "consume a significant amount of [his] time," the Court agrees. *Wheatley*, 390 F.3d at 333. Furthermore, viewing the facts in the light most favorable to the plaintiffs, the Court finds that Whitlock is also a valid comparator for both McGee and Evans.

The testimony of the Remediation Geologists and their supervisors, as well as the core duties and responsibilities memorialized in their EWPs, show that Whitlock shares a "'common core' of tasks" with both McGee and Evans. *Brewster*, 788 F.2d at 991; (*see* ECF No. 48, at 6–7 ¶¶ 1–5). The parties agree that Whitlock's EWP includes a section for "Technical Assistance on Geologic and Hydrogeologic Matters," a responsibility he alone has because of his extensive knowledge of "karst hydrology." (ECF No. 42, at 17 ¶ 78.) The Court notes, however, that these duties comprise, at most, five percent of Whitlock's job. (*Id.*) Further, Whitlock described this

---

[21] Rather, a logical inference is that because Evans's annual tasks include a variety of administrative duties that Spangler's do not, Spangler has additional time to conduct visits. Indeed, Evans's EWP performance evaluations note that she conducted site visits "as appropriate." (ECF No. 48-22, at 1, 6, 12.)

aspect of his work as spending "a small portion of [his] time responding to people in different sections or even the central office to provide them with additional information related to geology in Southwest Virginia." (ECF No. 42-17, at 4:8–4:16.) During deposition, he confirmed that each request may take several days to resolve but that he does not "get a request every month." (*Id.* at 10.) Further, when asked whether Whitlock received "extra pay for [such] activities," his long-time supervisor responded, "No." (ECF No. 42-19, at 4.) Viewing the evidence in the light most favorable to the plaintiffs, the Court asks whether Whitlock's additional task makes his work "substantially different" and finds that it does not.[22] *Brewster*, 788 F.2d at 991 (quoting *Brobst*, 761 F.2d at 156). Thus, the Court deems Whitlock a proper comparator for Moran, McGee, and Evans.

### B. The Defendant's Affirmative Defenses

The Court finds that the plaintiffs have established a prima facie case under the EPA by identifying two valid comparators—Spangler and Whitlock—who perform equal work for higher wages. Accordingly, "the burdens of production *and* persuasion [now] shift to [DEQ] to show that the wage differential was [in fact] justified by" either "(1) a seniority system; (2) a merit system; (3) a pay system based on quantity or quality of output; or (4) a disparity based on any factor other than gender." *Md. Ins. Admin.*, 879 F.3d at 120 (emphasis in original) (citing 29 U.S.C. § 206(d)(1); *Corning Glass*, 417 U.S. at 195). DEQ contends that several factors other than gender justify Spangler's and Whitlock's higher wages.

---

[22] The Court notes that Whitlock receives such requests based on his breath of geologic knowledge. This fact is irrelevant to whether Whitlock's duties as a Remediation Geologist are equal to the work performed by female Remediation Geologists like Moran, McGee, and Evans. Whitlock's decades of work and specialized knowledge are, however, relevant to DEQ's proffered defense.

i. John Spangler

DEQ asserts that its reliance on Spangler's previous, private-sector salary when it set his starting salary justifies the difference between Spangler and the plaintiffs' wages today and, for Moran, until her retirement in 2020. This Court has previously held that employers may raise prior salary as an affirmative defense in EPA cases as a "factor other than sex." *See Abe,* 2021 WL 1250346, at *4. The undisputed evidence before the Court bolsters this explanation.[23] Bridgman, Spangler's manager in the PRO, testified during her deposition that she "made every effort to get [Spangler's] salary offer as high as possible" because she knew that his private sector job probably paid more than DEQ. (ECF No. 42, at 12 ¶ 50.) Indeed, when Spangler's former employer offered a salary increase to entice him to stay, Bridgman encouraged DEQ's HR to increase its initial offer "such that [Spangler made] a lateral move."[24] (*Id.* at 12–13 ¶ 50.) The plaintiffs offer no evidence to the contrary and have repeatedly lamented that a candidate's current salary was "the primary factor" used by DEQ in setting starting salaries when DEQ hired both Spangler and the plaintiffs. (ECF No. 42, at 11; ECF No. 48, at 3; *see also* ECF No. 1, at 7 (alleging that "DEQ utilized the prior salary data to fix a starting salary for each female employee and similarly, for male employees").)

Nevertheless, the plaintiffs attempt to circumvent their express concessions that DEQ used Spangler's prior salary history to set his starting pay by arguing that Fourth Circuit precedent

---

[23] Indeed, the plaintiffs concede that this is so. (*Compare* ECF No. 42, at 13 ¶ 53 ("At the time Spangler was hired, DEQ was using an applicant's 'most recent salary' to make an offer within the applicable pay band. Accordingly, Spangler's starting salary at DEQ 'was based on his private sector salary.'"), *with* ECF No. 48, at 5 ¶ 8 ("Plaintiffs admit Defendant's averred Statements Nos. 42-80.").)

[24] "Prior to joining DEQ, Spangler worked as a senior environmental scientist for a private contractor with a salary of $57,000." (*Id.* at 20 ¶ 93.)

requires specific, contemporaneous evidence, such as "the testimony of the salary decision-maker[,] . . . as to the motivation for" Spangler's offer that explains precisely the reason for the discrepancy.[25] (*Id.* at 32.) Because DEQ has not produced testimony from HR personnel expressly explaining why DEQ offered Spangler the exact salary it did, the plaintiffs contend that DEQ's defense must fail.

The plaintiffs' argument proves too much. The Court finds that Bridgman and Spangler's testimony conclusively establishes that DEQ relied on Spangler's prior salary when it offered him $57,000 in 2007. The plaintiffs may not demand that DEQ provide their chosen form of contemporaneous evidence to prove what no one contests.

The plaintiffs also argue that "[p]ublic employers should only be able to rely on prior salary if the agency has determined that the prior salary accurately reflected the employee's ability based on . . . job-related qualifications." (*Id.* at 35.) They assert that even if DEQ based Spangler's starting offer on his prior salary, there is no evidence that it did so on the basis of Spangler's job-related qualifications. *See Abe*, 2021 WL 1250346, at *4 (declining to decide whether *Md. Ins. Admin.* imposes a job-relatedness requirement for affirmative defenses in EPA cases). But even if the Court were to find that "factors other than sex" must be job related, *see Rizo v. Yovino*, 950 F.3d 1217, 1224 (9th Cir. 2020), Spangler's defense would still prevail.

The record shows that Spangler performed work with DEQ before they hired him as a full-time employee in 2007. Based on Spangler's excellent performance and demonstration of the

---

[25] "DEQ has not produced testimony from the actual decision-making Human Resource [("HR")] personnel as to the salary set for Spangler." (ECF No. 48, at 37.) "DEQ . . . has offered no testimony[] as to the consideration of each of the thirteen pay factors required when the salary when the salary [was] fixed for" Spangler. (*Id.* at 13 ¶ 37.) "DEQ has failed to provide a DEQ Employment Decision or any other contemporaneous document justifying Spangler's salary when compared to the [p]laintiffs' lower salaries." (*Id.* at 34.)

high-level skills necessary for handling challenging cases, DEQ wanted to hire him.  (*See* ECF No. 42-9, at 19:14–21:15.)  And, because management at DEQ knew that Spangler made $57,000 as a senior environmental scientist in the private sector, they crafted an equivalent salary offer, pursuant to the compensation policy in effect at the time.  *See Spencer*, 919 F.3d at 206 (granting summary judgment, in part, on a finding that there was "no dispute that the wage difference at issue resulted from the [defendant] setting [male professors] pay at 75% of their previous salaries as administrators").  *But see EEOC v. Enoch Pratt Free Library*, 509 F. Supp. 3d 467, 479 (D. Md. 2020) (concluding that although defendants may have demonstrated that a male comparator "was *hired* for permissible reasons unrelated to his sex," they failed to "produce *evidence* that [he] was paid more for the job he actually performed . . . based on a factor other than sex") (emphasis in original).

The Court therefore concludes that no rational jury could reject DEQ's proffered defense that a factor other than sex explains Spangler's higher wage.

### ii. William Whitlock

According to DEQ, "Whitlock's salary difference is explained by his length of service and the legislative salary increases he received as a state employee." (ECF No. 54, at 2.)  "[T]he EPA requires that a factor other than sex *in fact* explains the salary disparity." *Md. Ins. Admin.*, 879 F.3d at 123.  On the record currently before the Court, DEQ has not proven that Whitlock's length of service and an unofficial policy of seniority explain his higher salary "so convincingly that a rational jury could not have reached a contrary conclusion." *Id.* at 121.

Although DEQ provides a detailed summary of Whitlock's salary history, (*see* ECF No. 42 at 19–20 ¶ 91), DEQ fails to explain why frequent state wage increases did not translate into similar wage growth for the plaintiffs, particularly plaintiff Moran.  Indeed, DEQ proffers that

"[b]etween 1983 and 2014 Whitlock received state employee raises that increased his salary from [approximately \$18,000] to \$60,381.00." (*Id.*) But DEQ does not explain when such increases took effect or what Whitlock's state salary was when DEQ hired the plaintiffs were in 1992, 2000, or 2001. Whitlock transferred to DEQ in March 2014 as a Groundwater Characterization Geologist—a position with different core duties than a Remediation Geologist. (ECF No. 48, at 40.) Pursuant to this transfer Whitlock's salary rose from \$60,381 to \$68,00.[26] (ECF No. 48, at 40–41.) Then, the following July, Whitlock sought a position as a Remediation Geologist. Although Whitlock did not receive an additional increase in pay when he became a Remediation Geologist, DEQ offers no contemporaneous evidence for why Whitlock was hired into that role earning at least \$68,000 annually to perform the same job that Moran and Evans performed for less money. Indeed, at the time of Whitlock's transfer, Moran earned just \$59,828—almost \$8,000 less—for the same work. (*Id.*) To put the difference in perspective, Whitlock's salary when he became a Remediation Geologist in *2015* exceeds what Plaintiff Evans earns *today*.[27] Further, DEQ points to Whitlock's length of employment with the Commonwealth as evidence of an unofficial seniority system, but as DEQ readily admits, all jobs are not equal. (ECF No. 54, at 8–9.) Whitlock's lengthy employment with the Commonwealth in various roles does not automatically render him more knowledgeable or qualified to perform the duties of Remediation

---

[26] Whitlock did not accept DEQ's original salary offer. A standard increase for such transfers is "typically" five percent. (ECF No. 48, at 41; ECF No. 48-36.) Based on his knowledge of what the Groundwater Characterization Geologist Coordinator position entailed, and the fact that he would be "moving from Southwest Virginia to Richmond," Whitlock negotiated for and received an 11.3% increase. (ECF No. 48, at 41; ECF No. 42-18, at 12–13.)

[27] Evans's current salary is \$60,465. (ECF No. 42 at 18–19 ¶ 88.) Moran retired in January 2020 with a salary of \$67,545. (*Id.* at 17–18 ¶ 81.)

Geologist and thus explain why DEQ paid him more than female employees to do *that* work.[28]

In summary, DEQ presents evidence that Whitlock brings a breadth of knowledge to his work which could, when combined with his length of service to the commonwealth, explain the wage discrepancy. But DEQ bears the burden of establishing that Whitlock's higher wages were *in fact* based on factors other than sex. Because the Court finds that DEQ has not met their burden of persuasion, it will deny DEQ's motion for summary judgment. *See Earl*, 2016 WL 1078280, at *13 (finding summary judgment improper "[b]ecause there is a chance, however large or small it might be, that a reasonabl[e] jury could find in Plaintiffs' favor on the EPA claim") (quoting *Kennedy v. Va. Polytechnic Inst. & State Univ.*, 781 F. Supp. 2d 297, 301–02 (E.D. Va. 2011) (alterations in original).

### C. Willfulness

"A two-year statute of limitations applies to ordinary violations of the [EPA], but a three-year statute of limitations applies to willful violations."[29] *Hantz v. Prospect Mortg., LLC*, 11 F. Supp. 3d 612, 616 (E.D. Va. 2014) (citing 29 U.S.C. § 255(a); *Desmond v. PNGI Charles Town Gaming, L.L.C.,* 630 F.3d 351, 357 (4th Cir. 2011)); *see also Brinkley-Obu*, 36 F.3d at 346 n.20. "When a jury awards damages for a[n] . . . [EPA] violation, the jury is allowed to award a sum compensating the victim only for the period of time permitted under the statute." *Brinkley-Obu*, 36 F.3d at 346 n.22. Accordingly, a jury could not award damages for any violations occurring

---

[28] The Court notes that this contrasts to evidence in the record concerning DEQ's hiring of Spangler, which demonstrates that Spangler's ability to work on the cases his supervisor deemed "the worst of the worst" contributed directly to his salary offer. (*See* ECF No. 42-9, at 9–10, 20.)

[29] Here, DEQ does not contest that it paid higher wages to male Remediation Geologists than it paid to the plaintiffs in the two years prior to the filing of this action. Accordingly, it does not assert that the statute of limitations bars the plaintiffs' claims. Rather, the parties dispute the applicable statute of limitations as it pertains to damages recoverable.

prior to April 21, 2019, unless DEQ willfully violated the EPA.

"In order to prove a willful violation of the Act, a plaintiff must demonstrate that 'the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute.'" *Emswiler v. Great E. Resort Corp.*, 602 F. Supp. 2d 737, 743 (W.D. Va. 2009) (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)). But because "[w]illfulness is a factual determination that is typically submitted to the jury," the Court at summary judgment "is limited to determining whether [the p]laintiff[s] ha[ve] adduced sufficient evidence upon which a reasonable jury could find in [their] favor." *Id.* (quoting *Fowler v. Land Mgmt. Groupe, Inc.*, 978 F.2d 158, 163 (4th Cir. 1992); *Glunt v. GES Exposition Servs., Inc.*, 123 F. Supp. 2d 847, 861 (D. Md. 2000)).[30]

Here, the plaintiffs assert that "DEQ showed reckless disregard for the Commonwealth's own policy regarding the internal alignment of salaries, and toward the [EPA]'s command that disparity in wages between men and women performing the same work be abolished."[31] (ECF No. 48, at 47.) They argue that—based on evidence of significant pay disparities between male and female DEQ employees, and clear evidence that female Remediation Geologists receive lower pay for performing equal or more work than male Remediation Geologists—the question of willfulness

---

[30] "In *Glunt,* for example, the Court found that a reasonable jury could make a finding that there had been a willful violation of the [EPA] in light of evidence that there was a pattern of pay disparities between male and female employees, that the plaintiff's employer knew her work was superior to others yet her salary was not commensurate with her performance, and that one of the plaintiff's subordinates was paid more than she was." *Id.* (citing *Glunt*, 123 F. Supp. 2d, at 861.)

[31] The plaintiffs define "Internal Salary Alignment" as "a fairness criterion that takes into consideration the proximity of one employee's salary to the salaries of others who have comparable levels of training and experience; duties and responsibilities; performance; and knowledge, skills, abilities, and competencies." (ECF No. 48, at 48.) They contend that despite having such a policy in place, DEQ took no steps to ensure salary alignment among Remediation Geologist and that mid-level management, such as Evans and Spangler's supervisor, received no training or information on the policy. (*Id.* at 47; ECF No. 48-30, at 9.)

should go to the jury. Further, the plaintiffs point to a culture within DEQ of discouraging female employees from discussing their salaries with each other. (*Id.* at 47–48; ECF No. 48-31, at 12.) DEQ argues that

> there can be no better evidence that DEQ's use of prior salary to establish the [p]laintiffs' starting salary . . . cannot constitute a willful violation of the EPA than the fact that this Court has already . . . held that "the Fourth Circuit allows employers to use prior salary as an affirmative defense in EPA cases."

(ECF No. 42, at 47 (quoting *Abe*, 2021 WL 1250346, at *1).) But DEQ does not assert that DEQ's reliance on prior salary explains the wage discrepancy between William Whitlock and the plaintiffs. The Court finds that the plaintiffs have adduced sufficient evidence to raise a question for the jury as to whether any violation of the EPA by DEQ was willful. Accordingly, the Court leaves this issue to the factfinder. *See Kennedy*, 781 F. Supp. 2d, at 304.

## V. <u>CONCLUSION</u>

For the reasons outlined above, the Court finds that the plaintiffs have identified two acceptable comparators: William Whitlock and John Spangler.[32] The Court further finds, however, that no rational jury could reject DEQ's proffered defense that Spangler's wage discrepancy is based on a factor other than sex. Finally, the Court finds that genuine issues of material fact exist regarding whether the pay disparity between Whitlock and the plaintiffs was due to factors other than sex. The Court will, therefore, deny DEQ's motion for summary judgment and allow the plaintiffs to proceed as to comparator Whitlock.

An appropriate Order shall follow.

Date: 30 August 2022
Richmond, VA

/s/
John A. Gibney, Jr.
Senior United States District Judge

---

[32] The Court finds that Jonathan Newbill is not a valid comparator for any of the plaintiffs. *See supra* p. 15.